IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CYNTHIA BENNETT and
AMANDA MEADS,
        Plaintiffs,

v.                                 Case No. 18-1295-JTM

LUIGI'S ITALIAN RESTAURANT and
GIANNI TOPALLI,
        Defendants.

**MEMORANDUM AND ORDER**

This matter is before the court on the plaintiffs' Motion for Entry of Default Judgment (Dkt. 11). By prior Order (Dkt. 13) the court found defendants Luigi's Italian Restaurant and Gianni Topalli to be in default as to the allegations of plaintiffs' Complaint but elected to hold an evidentiary hearing under Fed. R. Civ. P. 55(b)(2) to determine plaintiffs' damages. The court's prior order explained that although defendants were in default and it accepted as true all factual allegations in plaintiffs' Complaint, the court was still obligated to determine whether those facts established a basis for entry of judgment and whether the damages claimed were supported by the record. *See Mathiason v. Aquinas Home Health Care, Inc.*, 187 F.Supp.3d 1269, 1274 (D. Kan. 2016).

Plaintiffs did not specify the amount of monetary damages sought on any of their claims until the Motion for Default Judgment was filed with declarations by both plaintiffs and their attorney. For the first time in that motion, plaintiffs requested an award of $64,000, which encompassed $27,000 in damages to each plaintiff and a $10,000

fee award to their attorney. Further broken down, the $27,000 sought by each plaintiff consisted of $25,000 "for front pay, back pay, and emotional distress" (Dkt. 11-1, p. 1; Dkt. 11-2, p. 2) and an estimated $2,000 in unpaid wages (Dkt. 11-1, p. 1; Dkt. 11-2, p. 1). The requested fee award was made pursuant to the FLSA. (Dkt. 11-3, p. 2). The declaration submitted by plaintiffs' attorney in support of the Motion for Default Judgment specified that plaintiffs' claims for damages consisted of:

(a) Past and future earnings plus mental anguish as a result of sexual harassment and/or retaliation in violation of Title VII of the Civil Rights Act and the Kansas Act Against Discrimination;

(b) Unpaid wages, refusal to supply wage information, and punitive damages as a result of violations of the FLSA;

(c) Attorney fees related to attorney's representation of plaintiffs on their FLSA claims. (Dkt. 11-3, p. 2).

An evidentiary hearing on damages was held on July 22, 2019. Both plaintiffs were present at the hearing, and defendant Topalli appeared at the hearing, albeit appearing late. Both plaintiffs and defendant Topalli testified. Plaintiffs submitted four exhibits at the time of the hearing, including their EEOC charges of discrimination (Exhibits 1 and 3), medical records (Exhibit 2), and a declaration in support of the attorney fee award (Exhibit 4). At the conclusion of the hearing, plaintiffs requested an increased award of damages over what had originally been requested in the declarations submitted with the Motion for Default Judgment:

(a) As to plaintiff Meads: lost wages and benefits of $25,000; future wages and benefits of $25,000; compensatory damages of $800,000; unpaid wages and tips of $2,000;

(b) As to plaintiff Bennett: lost past and future wages from the date of the award of $70,000; compensatory damages of $500,000; unpaid wages and tips of $4,000; and

(c) Attorney fees as to both plaintiffs of $24,935.00. (Transcript, Dkt. 19, 70-71).

Subsequent to the hearing, plaintiffs submitted additional documentation in support of their claims, including documentation related to medical expenses on behalf of plaintiff Meads and wage and tip information related to plaintiff Bennett.

**Plaintiffs' Claims for Sexual Harassment/Retaliation Under Title VII of the Civil Rights Act and the Kansas Act Against Discrimination (KAAD)**

**A.      Do plaintiffs' allegations establish a violation of law?**

**1.      Sexual Harassment**

Courts have long held that "a plaintiff may establish a violation of Title VII [of the Civil Rights Act] by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399 (1986). But, to sustain an action in that regard, the sexual harassment must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (internal quotation marks and citations omitted). Whether an environment is hostile or abusive is determined by looking at a totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367 (1993). Courts may also consider any psychological harm suffered by the plaintiff to determine whether an environment is actually abusive, but while that factor is relevant, "no single factor is required" to establish a Title VII violation. *Id.*

Based upon the allegations of the plaintiffs' Complaint, along with their testimony at the hearing, the court finds that plaintiffs established the work environment created by defendants Topalli and Luigi's was hostile and abusive, that the hostility stemmed from discrimination based upon plaintiffs' sex, and that the nature of the harassment they suffered was sufficiently severe or pervasive as to alter the conditions of their employment and create an abusive working environment.

Both Meads and Bennett testified that they were subjected to harassment and abusive sexual comments at every shift. (Tr. 8, 40). This treatment included offensive sexual comments and unwelcome physical contact. Meads testified that Topalli "brought up sex constantly," made sexual jokes about the food at the restaurant, would brush up against her and touch her at work, requested to have sex with her, and implied that if she did not comply she would not have her position much longer. (Tr. 6-7). She also testified this harassment continued with Topalli following her home and then forcing her to drive to a lake, where he continued to proposition her for sex. (Tr. 6-7, 25-28). Meads testified this treatment left her embarrassed and humiliated, subject to "constant panic attacks and fear," and that she had "been living in fear since he did this." (Tr. 9). Bennett testified that she was subjected to repeated sexual comments, questions about her personal sex life, calls at home, direct requests for her to have sex with Topalli, and that eventually Topalli

exposed his genitals to her at the restaurant. (Tr. 39). She testified that Topalli's behavior made her feel worthless, stupid, confused, scared, and not good at her job, and that it exacerbated her already-existing PTSD causing hospitalization and affecting her personal relationships. (Tr. 40, 42-44).

While both plaintiffs exhibit pre-existing conditions of anxiety or PTSD, both plaintiffs testified the abusive work environment at Luigi's exacerbated these conditions. As the Supreme Court has held, even without tangible psychological effects "the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their … gender … offends Title VII's broad rule of workplace equality." *Harris,* 510 U.S. at 22. In this case, the allegations of the Complaint and plaintiffs' testimony establish that Topalli created a work environment abusive to plaintiffs because of their gender, in violation of Title VII.[1]

Moreover, the court finds defendant Luigi's to be liable for Topalli's conduct. Topalli was the owner of the restaurant, responsible for the day-to-day operations of the restaurant and plaintiffs' direct supervisor at the time of the harassment. "An employer may be liable for sexual harassment based upon the conduct of a supervisor if any of the following conditions are met: (1) the supervisor committed the harassment while acting in the scope of his employment; (2) the employer knew about, or should have known about, the harassment and failed to respond in a reasonable manner; (3) employer manifested in the supervisor the authority to act on its behalf, such manifestation resulted

---

[1] Because the court finds liability under Title VII, the court declines to address plaintiffs' claims under the KAAD as any award under that statute would be duplicative.

in harm to plaintiff, and plaintiff acted or relied upon apparent authority in some way; or (4) employer delegated authority to supervisor to control plaintiff's work environment and supervisor abused that delegated authority by using that authority to aid or facilitate the perpetration of harassment." *Huffman v. City of Prairie Vill., Kan.*, 980 F.Supp. 1192, 1202 (10th Cir. 1997) (citing *Harrison v. Eddy Potash, Inc.*, 112 F.3d 1437, 1446 (10th Cir. 1997), vacated on other grounds by *Eddy Potash, Inc. v. Harrison*, 524 U.S. 947 (1998)). The court finds the allegations of the Complaint and plaintiffs' testimony sufficient to establish that Topalli used his position as the owner of the restaurant and plaintiffs' direct supervisor to perpetrate the harassment. Luigi's consequently shares liability for the Title VII violations in this case.

### 2.     Retaliation

Plaintiffs' claims of retaliation in violation of Title VII and the KAAD are less specific than their claims of sexual harassment. As to Meads, the Complaint alleges merely that "[d]efendants retaliated against Amanda because of her protected conduct [in complaining about the sexual harassment." (Dkt. 1, p. 5). As to Bennett, the Complaint alleges that she engaged in protected conduct "by being identified as a witness" to Meads's complaint of sexual harassment, and that "[defendants] cut Cynthia's work hours because of her protected activity." (*Id*.).

Unfortunately plaintiffs' testimony at the hearing did not do much to clarify their claims of retaliation. The record shows that Meads left employment as a result of the harassment, but there is no indication she was fired from her position in retaliation for reporting her claims of sexual harassment. She alleges that she was shorted on wages and

tips, but it is not clear from either the Complaint or Meads's testimony that this was in retaliation for her complaint of harassment rather than caused by poor bookkeeping or some other motivation. Meads's clearest complaint of retaliation relates to her claim that she was promised a management position to begin in mid-December 2017 with a higher wage and more hours, "and when [she] explained to [Topalli] that what he was doing was not okay, he took that from me." (Tr. 20-21).

Bennett claims that she was originally working approximately 30 hours per week, but that her hours were reduced to approximately two days per week in December 2017 after Topalli learned she was a "key witness" to Meads's harassment claims. (Tr. 38-39). However, the payment records submitted by Bennett post-hearing do little to confirm her allegations; those payment records begin in March 2018 and confirm that at that time Bennett appears to have been working approximately two days per week, well under 30 hours. But those payment records do not show when Bennett's hours were cut, and show that Bennett was, in fact, given additional hours in April 2018. Moreover, there is little in the record to connect Bennett's claims of being a "witness" for Meads to any alleged retaliation. It appears from Meads's medical records that she took steps to obtain a protection from abuse order (PFA) against Topalli in December 2017 with a court date in January 2018 (Hearing Ex. 2), but there is no direct evidence that Bennett was listed as a witness in those proceedings or that her hours were cut directly after.

Where there is no direct evidence of retaliation, courts follow a three-step framework. First, the plaintiff must present a prima facie case for retaliation. Next, the defendant must respond with legitimate, nonretaliatory reasons for the adverse

employment action. If the defendant does so, the plaintiff must show defendant's nonretaliatory reasons were pretextual. *Debord v. Mercy Health Sys. of Kansas, Inc.*, 737 F.3d 642, 655 (10th Cir. 2013) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817)(1973)). To make a prima facie case of retaliation, plaintiffs must show (1) that they engaged in protected opposition to discrimination; (2) that they were subject to an adverse employment action; and (3) that a causal connection exists between the protected activity and the adverse action. *Roberts v. Roadway Exp., Inc.*, 149 F.3d 1098, 1103 (10th Cir. 1998) (citing *Jeffries v. Kansas*, 147 F.3d 1220, 1231 (10th Cir. 1998), abrogated on other grounds by *Burlington Indus., Inc v. Ellerth*, 524 U.S. 742 (1998)).

Even when accepted as true, the court finds the factual allegations of the Complaint and the evidence presented at the hearing to be insufficient to establish even a prima facie case of retaliation. Other than Meads's single statement that Topalli "took away" her management position when she refused his advances, there is nothing in the record that indicates Meads was promised or guaranteed a management position by any certain date, nor is there any evidence that links Meads's claims of underpayment of wages and tips to the harassment. Similarly, there is no evidence in the record to corroborate Bennett's assertion that her hours were cut after December 2017 in direct retaliation for her being listed as a witness to Meads' harassment.

Consequently, the court finds that plaintiffs have failed to establish a claim of retaliation in violation of Title VII or the KAAD. *See Land v. Midwest Office Tech., Inc.*, 114 F.Supp.2d 1121, 1140 (D. Kan. 2000) (applying same legal standard for retaliation in Title VII cases to KAAD claims).

**B.** **Have plaintiffs adequately proven damages on their Title VII sexual harassment claim?**

Although this matter is presented to the court on default, plaintiffs retain the burden to prove the amount of damages to which they are entitled. "Damages may be awarded only if the record adequately reflects the basis for [the] award via a hearing or demonstration by detailed affidavits establishing the necessary facts." *Mathiason v. Aquinas Home Health Care, Inc.*, 187 F.Supp.3d 1269, 1275 (D. Kan. 2016) (quotation marks and citations omitted). In its prior Memorandum and Order (Dkt. 13) the court explained why the declarations submitted by plaintiffs were inadequate on their own to establish damages. The court thus considers whether the evidence presented at the hearing was sufficient to support plaintiffs' requested awards of back pay, lost future earnings, and compensatory damages.

**1.** **Lost Past & Future Earnings**

Title VII allows the court to use a variety of remedies, including back pay, to make a plaintiff whole. *Wulf v. City of Wichita*, 883 F.2d 842, 870 (10th Cir. 1989). The purpose of a back pay award is to "make whole discharged employees for their lost wages and not for extra expenses." *Id.* (quoting *Equal Employment Opp. Comm'n v. Sandia Corp.*, 639 F.2d 600, 626 (10th Cir. 1980)). A court may grant prejudgment interest on a back pay award where necessary to make plaintiff whole. *Baty v. Willamette Indus. Inc.*, 985 F.Supp. 987, 999 (D. Kan. 1997), *aff'd* 172 F.3d 1232 (10th Cir. 1999).

An award of front pay is an equitable remedy that may be awarded in the court's discretion. *Wulf*, 883 F.2d at 873-74. The Tenth Circuit has noted that awards of front pay

or future damages are necessarily uncertain and speculative, as the court cannot tell with certainty how long a given plaintiff might have held an employment position. *See id.* (citing *Equal Employment Opp. Comm'n v. Prudential Fed. Sav. and Loan Ass'n,* 763 F.2d 1166, 1173 (10ᵗʰ Cir. 1985)). Because that uncertainty is caused by the defendants, however, "they may not take advantage of an uncertainty that they themselves have created." *Id.* (quoting *Koven v. Consolidated Edison Co.,* 560 F.Supp. 1161, 1169 (S.D.N.Y. 1983) for proposition that "the mere fact that damages may be difficult of computation should not exonerate a wrongdoer from liability."). "In awarding front pay, the court must determine the amount required to compensate a victim for the continuing future effects of discrimination until the victim can be made whole. A front pay award must specify an ending date and must take into account any amount that the plaintiff could earn using reasonable efforts." *Baty*, 985 F.Supp. at 999-1000 (quoting *Carter v. Sedgwick County, Kan.,* 929 F.2d 1501, 1505 (10th Cir.1991)) (quotation marks and citations omitted).

The uncontested evidence here establishes that while neither plaintiff was fired, both plaintiffs either left or elected not to return to work as a result of the hostile work environment created by defendants. Consequently the court finds an award of back pay appropriate from the date plaintiffs left employment to the date the court entered default judgment on June 17, 2019. In Meads' case, the court finds the appropriate award of back pay to be $13,381.20 to compensate Meads for lost wages from the date she left employment on December 14, 2017 to June 17, 2019. The court's award is based upon Meads' testimony that she worked double shifts six days a week, and that those double shifts consisted of hours from approximately 10:30a to 2:00p and then from 4:00p to 9:30p.

Multiplying the approximate number of days that Meads would have worked during the applicable period (472 days) by her average hours and her hourly wage of $3.15 per hour results in an award of $13,381.20. The court acknowledges Meads's testimony that she earned an average of $100 in tips daily and that she anticipated a higher hourly wage and higher average daily tips upon a promised promotion to manager, but finds that testimony is not supported by other substantial evidence in the record. Even on default the court's award of damages must be supported by substantial competent evidence, and the court finds no evidence in the record to support Meads's claims concerning her average tips or her claim that she would have been promoted to manager effective mid-December 2017.

In Bennett's case, the court finds a back pay award of $3,225 to be supported by substantial competent evidence. Bennett testified she left employment at Luigi's on July 2, 2018, and that she worked approximately 30 hours per week at a wage of $2.15 per hour. Multiplying the days Bennett would have worked between July 2, 2018 and June 17, 2019 (350 days) by her average hours per week and hourly wage results in an award of $3,225. The court acknowledges evidence in the record showing that Bennett's hours were reduced substantially beginning at least in March, 2018, but Bennett testified that her hours were reduced involuntarily after December, 2017, and that she worked an excess of hours prior to her departure in July, 2018. Given the testimony, the court finds the evidence supports an award of back pay based upon an average of 30 hours worked per week during the applicable period. As with Meads's award, the court's award of back pay to Bennett does not include an award for tips, as the court finds insufficient evidence

in the record to substantiate Bennett's claims in that regard. The court finds an award of pre-judgment interest on the back pay awards to be appropriate and necessary to make plaintiffs' whole in this case, and awards pre-judgment interest at the statutory rate of ten percent per annum. *See* K.S.A. 16-201.

The court finds that a front pay award is appropriate in both cases, despite the speculative nature of such an award. Meads specifically testified that she intended to work in her position as long as possible (Tr. 12) and there is no suggestion in the record that Bennett would have left employment at Luigi's but for the situation created by defendants. The server positions vacated by plaintiffs, however, are not what the court would characterize as "highly-skilled" positions, nor are they positions that exist in limited numbers in the typical economy. In addition, the positions vacated by plaintiffs were not highly paid. The court acknowledges plaintiffs' testimony as to the negative effects of the harassment upon them, but it does not find any evidence in plaintiffs' testimony or the records submitted to the court that the negative psychological effects created by defendants' conduct were so pervasive that plaintiffs were unable to continue to work at all. The court thus concludes that plaintiffs should be able to find replacement work of similar quality and compensation and that an award of front pay of three months from the court's grant of default judgment is appropriate to compensate plaintiffs for the future effects of the harassment that they suffered.

In Meads's case, a front pay award of three months based upon her average of 54 hours per week and hourly wage of $3.15 per hour results in an award of $2,041.20. For Bennett, a front pay award of three months based upon her average of 30 hours per week

and hourly wage of $2.15 per hour results in an award of $774. The court declines to award front pay based upon tips for the same reasons as stated with respect to back pay and declines to award prejudgment interest on front pay.

## 2. Compensatory Damages

The declarations submitted with plaintiffs' motion for entry of default judgment did not separate a claim for compensatory damages based upon their claims of mental anguish and suffering; instead, each plaintiff claimed $25,000 in damages inclusive of back pay, lost future wages, and mental anguish damages. At the hearing, however, Meads indicated that $800,000 was the amount she believed would adequately compensate her for the mental distress suffered as a result of the harassment (Tr. 16), while Bennett claimed $500,000 was sufficient (Tr. 46). Neither plaintiff provided a specific explanation for the amount claimed.

Claims for compensatory damages, like other damage awards, "must be supported by substantial evidence." *Wulf*, 883 F.2d at 874-75. Compensatory and punitive damages under Title VII are governed by 42 U.S.C. § 1981a(b), which provides in part:

**(1) Determination of punitive damages**
A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

**(2) Exclusions from compensatory damages**
Compensatory damages awarded under this section shall not include backpay, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964.

**(3) Limitations**
The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party —

    **(A)** in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $50,000 ….

The court finds that both plaintiffs are entitled to an award of damages to compensate them for the mental suffering and anguish experienced as a result of defendants' conduct, but the amounts of $800,000 and $500,000 claimed by Meads and Bennett, respectively, are not supported by the evidence presented. Both plaintiffs testified as to their need for increased mental health intervention in light of the harassment by defendant Topalli, but both plaintiffs acknowledge pre-existing and occasionally severe mental health conditions which had caused them to engage in therapy prior to defendants' conduct. While Topalli's actions exacerbated those conditions, then, the record is clear that Topalli's actions were not the sole cause of the mental health conditions of which plaintiffs complain. Further, the record is devoid of testimony on behalf of either plaintiff as to the observed or expected long-term psychological effects expected to occur as a direct result of the sexual harassment experienced. The record is also devoid of substantial documentary evidence. While Meads did submit a variety of records from her therapist as well as medical billings, Bennett testified that she had medical records and records of medical expenses but failed to ever provide those to the court.

The court's award of compensatory damages is based in part upon the therapist records and medical expenses submitted by Meads. Although the additional medical billing records submitted to the court in August, 2019 show that Meads visited her therapist 39 times between November 1, 2017 and June 28, 2019, the court cannot determine with certainty from the billing records that all of these visits were directly related to Meads's employment at Luigi's. The court finds the best evidence of the visits related to her employment at Luigi's to be the therapy records submitted as Exhibit 2 at the hearing, which identified 13 visits as having direct connection with the psychological effects Meads suffered as a result of the harassment. Comparing those 13 visits to the medical billing records, Meads' medical expenses related to the harassment were $2,775.

In addition to the medical expenses for which Meads deserves compensation, the court finds that an additional award is appropriate to compensate plaintiffs for emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life associated with defendants' actions. Meads testified that she suffered embarrassment, humiliation, "constant panic attacks and fear" and that she had been forced to increase medical supplements to address her anxiety as a result of the harassment (Tr. 9-10). She also testified that she thinks about the harassment on a near daily basis and that she lives in continuous fear of retaliation. (Tr. 13-14). Finally, Meads testified that the harassment had caused her to "regress" from a point she had previously reached through therapy and that she was now dealing with impulses to self-harm. (Tr. 33). Bennett testified that although she had been seeing a therapist since 2011, the sexual harassment at Luigi's made her feel like she had gone back to "ground zero" with flashbacks and nightmares.

(Tr. 41-42). She further testified that her regression led to her hospitalization five or six times, and that it affected her relationship with her fiancé. (Tr. 43). Based upon this uncontested testimony and the records presented by plaintiffs, the court awards $5,000 to each plaintiff to compensate them for emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

The court consequently awards plaintiff Meads $7,775.00 in compensatory damages and Bennett $5,000 in compensatory damages in relation to their Title VII harassment claims.

### 3.    Punitive Damages

Punitive damages can be awarded for a Title VII violation if the court finds that defendants engaged in discriminatory practices with malice or reckless indifference to plaintiffs' federally protected rights. 42 U.S.C. §1981a(b).   The "malice or reckless indifference" referenced in the statute does not depend upon a plaintiff to prove an employer engaged in egregious or outrageous conduct, but rather that the employer acted "'in the face of a perceived risk that its actions [would] violate federal law.'" *McInnis v. Fairfield Communities, Inc.*, 458 F.3d 1129, 1136-37 (10th Cir. 2006) (quoting *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 535-36, 119 S.Ct. 2118 (1999)). As used in §1981a, the term "malice" can be understood as being "motivated by evil motive or intent," while "reckless indifference" can be shown through a "'subjective consciousness' of a risk of injury or illegality or a 'criminal indifference to civil obligations.'" *Kolstad*, 527 U.S. at 535-36 (quoting *Smith v. Wade*, 461 U.S. 30, 56 103 S.Ct. 1625 (1983)). Because the statute speaks in terms of an "employer" acting recklessly or maliciously, the court is required to

determine who qualifies as the "employer" when it imposes direct punitive liability. *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1270 (10th Cir. 2000).

In this case, the court finds that defendants Topalli, as the owner and operator of Luigi's, and Luigi's itself constitute the "employer" for purposes of a punitive damage award under §1981a, and that it is appropriate to impose direct liability for punitive damages upon both. The court accepts as true the facts of plaintiffs' Complaint, as it must; those facts combined with plaintiffs' testimony at the hearing establish that Topalli, as both owner of Luigi's and plaintiffs' direct supervisor, subjected plaintiffs to repeated sexual comments, inappropriate physical touching, direct requests for sexual contact, and that he exposed himself to plaintiff Bennett. While Topalli himself largely denied plaintiffs' allegations at the hearing, his comment that "I may say joke in front of my wife but nothing to hurt them, you know," (Tr. 58) and his response to the court's inquiry that he would only have asked plaintiffs for sex "if I'm drunk but I never drank where I work, so," (*id.*) show a casual indifference to the gravamen of plaintiffs' claims. Based upon the totality of this evidence, the court finds Topalli's conduct indicative of a criminal indifference to civil obligations, and that Topalli was sufficiently aware of plaintiffs' federally protected rights to understand that such sexual harassment would have been contrary to those rights.

As to the appropriate award of punitive damages, the court notes that the purpose of the remedy is "to punish and deter" such future conduct, and the wealth and size of defendant are relevant considerations in that regard. *Deters*, 202 F.3d at 1273. At the same time, the Tenth Circuit has acknowledged that in cases of intentional discrimination

resulting in relatively small amounts of economic or compensatory damages, a higher ratio of punitive damages may be appropriate. *Id.* Under the circumstances of this case, the court finds that an award of $5,000 in punitive damages for each plaintiff is appropriate to punish defendants' inappropriate conduct and to deter such conduct in the future. Defendants' liability for punitive damages shall be joint and several.

**Plaintiffs' Claims for Violations of the FLSA and Kansas Wage Payment Act**

A. **Do plaintiffs' allegations establish a violation of the FLSA or Kansas Wage Payment Act (KWPA)?**

Both plaintiffs complain that defendants failed to pay them wages and tips for time worked, that defendants failed to provide accurate information concerning their wages earned, and that defendants retaliated against them when they engaged in protected activity under the FLSA, namely complaining regarding the lack of receipt of wages. (Dkt. 1, p. 6).

Even on default, plaintiffs as the employees have the burden on their FLSA claims to prove they performed work for which they were not properly compensated. *Donovan v. Simmons Petroleum Corp.*, 725 F.2d 83, 85-86 (10th Cir. 1983). *See also Garcia v. Tyson Foods, Inc.*, 890 F.Supp.2d 1273, 1284 (D. Kan. 2012), aff'd 770 F.3d 1300 (10th Cir. 2014) ("[t]he burden is on the plaintiffs to demonstrate with sufficient evidence that the employees have, in fact, performed work for which they were improperly compensated, and to produce sufficient evidence to show the amount and extent of that work, as a matter of just and reasonable inference."). Here, neither Meads nor Bennett submitted any wage payments with the Complaint or in support of their motion for default judgment.

Similarly, neither plaintiff produced any wage records at the hearing on damages: the only exhibits submitted at that hearing were the plaintiff's EEOC complaints, records from Meads' therapist, and their attorney's declaration in support of a fee award. The court made extensive inquiries of both plaintiffs during the hearing concerning their hours worked and customary wages and tips (*see* Tr. 17-19, 21-23, 30-31, 47-48) and specifically requested of both plaintiffs whether they had any kind of records establishing their hours worked and what they had been paid (Tr. 30, 47). The court noted "[a]ccurate income information is important in determining awards of this kind." (Tr. 31). Finally, both plaintiffs were given an opportunity to submit documentation in support of their claims after the hearing. Meads submitted documentation related to her medical expenses; Bennett submitted only a "sample" of wages and tips consisting of pay stubs dated 3/7/18, 3/21/18, 4/4/18, 4/18/18, 5/3/18, and 5/15/18.

Meads estimated at the hearing that in the time she was employed at Luigi's between October 6 or 10, 2017 and December 14, 2017, she was not paid approximately $2,000 that she was due in wages and tips. (Tr. 16, 17). Bennett estimates that in the time she was employed between November 2017 and July 2, 2018 that she was not paid approximately $4,000 in tips and wages. (Tr. 37, 44-45). Again, neither plaintiff provided documentary evidence in the form of pay stubs, handwritten notes, or otherwise to corroborate these claims; the claims were entirely based upon their memory and their assertions that their paychecks did not match their memory of their hours worked or cash tips they should have earned. (*See* Tr. 14-15, 44-45). Meads further claimed that approximately 60 percent of paychecks she received had no tip information on them (Tr.

15), but again, no pay stubs were submitted to confirm that assertion. The only pay stubs that were submitted to the court from Bennett show tips earned, and appear to account for tips earned by credit card and cash.

The documentation and testimony given by plaintiffs are woefully insufficient to establish their claims for lost wages and tips. The court is mindful that part of plaintiffs' claim is that Luigi's did not provide accurate records. It is true that employers have a duty to keep accurate records, and that if they fail in that duty the employees' burden to prove they performed work for which they were not paid becomes extremely difficult. *See Donovan,* 725 F.2d at 85-86. The court also is mindful that plaintiffs should not be penalized for Luigi's failure to provide adequate records, but as employees they still must meet their burden to show that they have "in fact performed work for which they were improperly compensated and … [to produce] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* (quoting *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687, 66 S.Ct. 1187 (1946), *superseded on other grounds, Integrity Staffing Sol'ns Inc.,* 574 U.S. 27 (2014)).

The court has not been provided sufficient evidence to find that plaintiffs have met this burden. Meads testified as to how many hours she worked on average, her hourly wage, and the average tips she made per day, she could have easily compared her records of hours worked and estimated tips to the amount that she was actually paid by Luigi's (as reflected by pay stubs she did receive or bank deposit records) to give an estimate of unpaid earnings supported by something other than vague memories and speculation. Bennett did provide the court with six pay stubs, but other than Bennett's assertion that

her paychecks were "not adding up to what [she] had and believed that [she] had at home, just jotted down" (Tr. 44) and that she "thinks" the missing amount added up to $4,000 (Tr. 45), the court has no evidence from which it can even infer as a matter of just and reasonable inference that Meads and Bennett were not properly compensated for the amount of work performed and tips earned.

Similarly, the court finds plaintiffs' evidence insufficient to establish that defendants violated the FLSA by failing to provide them wage information as requested. Aside from plaintiffs' assertion that they documentation they received was "poor," the only evidence in front of the court, Bennett's pay stubs, shows that at least between March and April 2018 those pay stubs were regularly issued; reflected hours worked, wages paid, and taxes withheld; and reflected tips earned on both a pay-period and year-to-date basis. The court infers from those pay stubs as well as plaintiffs' testimony that they did receive pay stubs, just did not necessarily retain them, and that defendants did provide plaintiffs with appropriate wage and hour documentation.

It is unclear precisely which portion of the KWPA plaintiffs claim defendants violated. To the extent plaintiffs claim defendants violated the KWPA by failing to pay a statutorily due minimum wage, such a claim may preempted by the FLSA. *See Blair v. TransAm Trucking*, 309 F.Supp.3d 977, 986 (D. Kan. 2018). To the extent plaintiffs claim defendants' failure to pay wages or tips due was improper withholding, plaintiffs' claims suffer the same deficit as their FLSA claims – namely, plaintiffs' inability to demonstrate by substantial evidence that they were entitled to wages due that were not paid. *See*

*Garcia,* 766 F.Supp.2d at 1187 (stating that in a KWPA claim, plaintiffs must independently establish they are entitled to the wages they seek).

Plaintiffs' claims for damages based on violations of the FLSA and KWPA are therefore denied. Because plaintiffs fail to establish liability under these provisions, the court need not reach plaintiffs' claim for monetary or punitive damages with respect to those claims.

**Plaintiffs' Request for Attorney Fees**

### A. Are plaintiffs entitled to an award of fees as the prevailing parties on their FLSA claims?

Plaintiffs have requested an attorney fee award under the FLSA, which allows a reasonable attorney's fee and costs in the event a plaintiff establishes a violation of the Act. *See* 29 U.S.C. § 216. Because the court has determined that plaintiffs are not entitled to the damages sought on their FLSA claims, plaintiffs are not entitled to a fee award under the FLSA.

Plaintiffs are, however, the prevailing parties on their Title VII claims of sexual harassment. As such, they are entitled to an award of fees under that Act. *See* 42 U.S.C. § 2000e-5(k); *see also Smith v. NW Fin. Acceptance, Inc.*, 129 F.3d 1408, 1418 (10th Cir. 1997); *Carter v. Sedgwick Cty.*, 36 F.3d 952, 956 (10th Cir. 1994). The amount of the fee to be awarded is in the court's discretion; however, a reasonable fee is typically calculated by "'the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.'" *Smith*, 129 F.3d at 1418 (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933 (1983)). If a plaintiff's counsel obtains excellent results, her attorney should

recover a full fee, which typically encompasses all hours reasonably expended on the litigation even if the plaintiff did not prevail on every claim raised in the litigation. *Hensley*, 461 U.S. at 435-36. On the other hand, when a plaintiff's attorney achieves partial or limited success, an award of all hours reasonably spent on the litigation at a reasonably hourly rate may be excessive, even if plaintiff's claims were interrelated and raised in good faith. *Id.*

**B.    Is the requested fee award reasonable and supported by the evidence?**

The court finds that plaintiffs' counsel here has achieved only partial success based upon the claims raised. Consequently, the court declines to award the full amount of attorney fees requested.

At the hearing, plaintiffs' counsel submitted Exhibit 4, a Declaration in Support of Attorney Fees. The Declaration establishes that plaintiffs' counsel is an attorney licensed and in good standing with the State of Kansas as well as Texas, Oklahoma, Nebraska, and Iowa. He has practiced law for over 26 years, a substantial portion of which has been spent in employment law practice, and is board certified in Labor and Employment Law by the Texas Board of Legal Specialization. Counsel has worked in both small and large firms and as general counsel for a multi-state employer, and he has been involved in setting hourly rates in each of those positions. Counsel submits based upon his personal experience and consultation with relevant sources that a reasonable hourly rate for the services performed in this litigation is $350 per hour for an attorney of his experience. Based upon its review of counsel's Declaration along with its own personal knowledge

of rates customarily charged in the community, the court concludes that a rate of $350 per hour for counsel's services, while on the high end, is not unreasonable.

Counsel's Declaration included contemporaneous time records reflecting time spent on this litigation, billed in tenths of an hour, beginning on January 30, 2018 and concluding on July 21, 2019 with preparation for the court's hearing. The court has carefully reviewed those time entries and determined that it is appropriate to exclude certain time entries from an award of compensation in this case. Counsel's representation of plaintiffs began in January 2018. It appears at that time counsel was representing Meads with respect to a protection from abuse proceeding in state court. Beginning in February 2018, counsel's time entries show that he was preparing EEOC and Kansas Human Rights Commission charges for Meads, and that there were ongoing charges that appear to relate to an employment discrimination case filed in state court. Time entries related to the state court discrimination proceedings continue through July 2018, including preparation of an amended petition, preparation for and appearance at various hearings in state court, negotiations with defendants' counsel, and various client meetings. From counsel's time entries, it appears the state court litigation was dismissed sometime between July and August 2018, and that a decision was then made to file the instant suit in federal court.

Counsel's time entries directly related to this case appear to begin on August 16, 2018 when counsel discussed "authorization to file lawsuit once client pay[s] filing fees." From October 21, 2018, the date the Complaint in this matter was filed, through July 21, 2019, counsel's time entries add up to a total of 28.2 hours. The court finds it appropriate

to include the time entry from August 16, 2018 of 1.0 for time spent meeting with the clients to discuss dismissal of their prior lawsuit and filing of the federal lawsuit, plus two hours in compensation for time counsel would have spent in travel and at the court's hearing on this matter. Consequently, the court finds the appropriate compensable time spent on this matter was 31.20 hours. 31.20 hours at an hourly rate of $350 hour results in an attorney fee of $10,920.

The court finds an attorney fee of $10,920 to be a reasonable award in this matter based upon the result obtained for plaintiffs and thus reduces the requested fee award accordingly. The court further finds that the expenses requested of $58 are just and reasonable based upon counsel's records and the results obtained in the case. Consequently, the court awards plaintiffs $10,920 in attorney's fees and $58 in expenses as the prevailing parties on their Title VII sexual harassment claims.

**Conclusion**

The court **GRANTS** in part and **DENIES** in part plaintiffs' Motion for Default Judgment (Dkt. 11) as set forth above, and awards the following in damages with liability for said damages to be shared jointly and severally by defendants:

(1)     To plaintiff Bennett:

(a) $3,225,00 in back pay, along with pre-judgment interest at the rate of 10% per annum;

(b) $774.00 in front pay;

(c) $5,000 in compensatory damages;

(d) $5,000 in punitive damages;

(2) To plaintiff Meads:

(a) $13,381.20 in back pay, along with pre-judgment interest at the rate of 10% per annum

(b) $2,041.20 in front pay;

(c) $7,775.00 in compensatory damages;

(d) $5,000 in punitive damages;

(3) To plaintiffs' counsel:

A reasonable attorney fee in the amount of $10,920.00 and $58.00 in expenses;

(4) All with post-judgment interest at the current rate of 0.13% until paid.

**IT IS SO ORDERED** this 30th day of March, 2020.

/s/ J. Thomas Marten
THE HONORABLE J. THOMAS MARTEN
UNITED STATES DISTRICT COURT